**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| RICKY SANABRIA, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-1012-CJB |
| | ) | |
| CORPORAL STEPHEN BRACKETT, II, | ) | |
| and LIEUTENANT BRIAN VANES, | ) | |
| | ) | |
| Defendants. | ) | |

---

Patrick C. Gallagher, JACOBS & CRUMPLAR, P.A., New Castle, DE; Attorney for Plaintiff.

Aaron M. Shapiro, Alan R. Silverstein, and Anna Brousell, CONNOLLY GALLAGHER LLP, Wilmington, DE; Attorneys for Defendants.

---

<u>**MEMORANDUM OPINION**</u>

November 19, 2024
Wilmington, Delaware

*Christopher J. Burke*

**BURKE, United States Magistrate Judge**

Presently pending before the Court in this civil matter is a motion for summary judgment ("Motion") filed by Defendants Corporal Stephen Brackett ("Brackett") and Lieutenant Brian Vanes ("Vanes," and collectively with Brackett, "Defendants"), (D.I. 67), pursuant to Federal Rule of Civil Procedure 56.  The Motion is opposed by Plaintiff Ricky Sanabria, Jr. ("Plaintiff"). For the reasons set forth below, the Motion is GRANTED-IN-PART and DENIED-IN-PART.[1]

## I.    BACKGROUND

### A.    Factual Background

The Court provides only a brief summary of relevant background facts here in Section I.A.  More detailed facts relating to the key summary judgment issues at play will be found in Section III.

As of July 2021, Plaintiff was an inmate at Howard R. Young Correctional Facility in Wilmington, Delaware ("HRYCF").  (D.I. 70, ex. H; D.I. 77, ex. A)  Plaintiff was sharing a cell with another inmate, Kiyohn Carroll ("Carroll"), in the "step-down" unit (a unit for inmates who had previously been in the disciplinary housing unit).  (D.I. 77, ex. B at 28-30)  Various interactions between Plaintiff and Carroll in that time frame led Plaintiff to feel unsafe living with Carroll.  (*Id*. at 35-39, 50, 104)  Specifically, these interactions caused Plaintiff to fear that Carroll would attempt to attack and sexually assault him.  (*Id*. at 34-35, 104)  On July 7, 2021, Plaintiff wrote a note requesting to speak with an officer about moving cells because he "didn't

---

[1]    The parties have jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings.  (D.I. 7; D.I. 8)

feel safe"; Plaintiff slid this note under a door to a room where certain of the prison's officials were located. (*Id*. at 54-55)

Brackett, a housing unit officer, received the note and met privately with Plaintiff soon thereafter. (*Id*. at 57-58; *id*., ex. D at 67-68) Plaintiff and Brackett discussed Plaintiff's reasons for wanting to move away from Carroll. (*Id*., ex. B at 58-60; *id*., ex. D at 70-74) Within a few hours, Brackett obtained approval for the move from two superiors (Sergeant Joseph Ritter and Lieutenant Robert Stewart), (*id*., ex. D at 71, 87-89; *id*., ex. J), and he moved Plaintiff into a new cell in the same unit, (*id*., ex. D at 106-07; D.I. 70, ex. H at DOC_000004).

However, less than two hours later, Plaintiff was moved back to his prior cell with Carroll. (D.I. 70, ex. H at DOC_000004; D.I. 77, ex. D at 107) Brackett told Plaintiff that a "higher up" ordered Plaintiff's return to his original cell. (D.I. 77, ex. B at 110-11) This higher-up was Vanes, who was the facility investigator. (*Id*., ex. C at 46, 185)

The next morning, on July 8, 2021, Carroll attacked Plaintiff in their cell by throwing a towel around Plaintiff's neck. (*Id*., ex. B at 74-75) Carroll bit off a piece of Plaintiff's left ear during the attack; the assault continued until Plaintiff ran out of the cell. (*Id*. at 75-81)

## B.    Procedural Background

Plaintiff commenced this action on July 31, 2022, pursuant to 42 U.S.C. §§ 1983 & 1988. (D.I. 1) The operative Amended Complaint contains two Counts. (D.I. 44) In each of Counts I and II, which are both titled "VIOLATION OF EIGHTH AMENDMENT[,]" Plaintiff alleges that Defendants violated his rights under the "Eight[h] Amendment to the United States Constitution" by failing to protect him from a substantial risk of harm that Plaintiff faced from his cellmate Carroll (i.e., a "failure to protect claim"). (*Id*. at ¶¶ 41-61; D.I. 86 (hereafter "Tr.")

at 79)[2]  Count I is filed against Brackett in his individual capacity, and Count II is filed against Vanes in his individual capacity.  (D.I. 44 at ¶¶ 41-61)

Defendants filed the instant Motion on July 31, 2024.  (D.I. 67)  The Motion was fully briefed as of September 9, 2024.  (D.I. 79)  The Court heard argument on the Motion on October 23, 2024.  (Tr.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986).  If the moving party has sufficiently demonstrated the absence of such a dispute, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial."  *Id.* at 587 (internal quotation marks, citation and emphasis omitted).  If the nonmoving party fails to make a sufficient showing in this regard, then the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  During this process, the Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

---

[2]      In these Counts, Plaintiff also makes a stray reference to "Article I, § 11 of the Delaware Constitution[.]"  (D.I. 44 at ¶¶ 53, 60)  In light of the content of the Amended Complaint, as well as the arguments made by Plaintiff in his briefing and during the hearing on the Motion, the Court does not really understand Plaintiff to be intending to pursue a claim pursuant to Article I, § 11 of the Delaware Constitution in this case or at trial.  And so the Court will make no further reference to that type of claim herein.

However, in order to defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). Facts that could alter the outcome are "material," and a factual dispute is "genuine," only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "If the evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." *Id.* at 249-50 (internal citations omitted).

A party asserting that a fact cannot be—or, alternatively, asserting that a fact is—genuinely disputed must support the assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

## III.    DISCUSSION

With their Motion, Defendants argue that the Court should grant summary judgment as to each of Counts I and II. (D.I. 67) Below, the Court will first address certain issues regarding the nature of the pleaded claims and how Plaintiff has characterized those claims. Thereafter, the Court will address the merits of the Motion as to Plaintiff's remaining claims.

### A.    Issues Relating to How Plaintiff Has Pleaded or Characterized His Claims

5

Defendants raise a few issues regarding how Plaintiff has pleaded or framed his claims.

Defendants first argue that because Plaintiff labeled his claims as "Eighth Amendment" claims in the respective Counts of the Amended Complaint, then summary judgment must be granted. This, they assert, is because: (1) the record clearly indicates Plaintiff was a pretrial detainee in the relevant time period, and (2) a pretrial detainee lacks standing to bring an Eighth Amendment claim. (D.I. 69 at 7-10)

In his briefing, Plaintiff initially responded to this argument by suggesting that there was at least a genuine dispute of fact as to whether he was a sentenced inmate (and not a pretrial detainee) in July 2021. (D.I. 76 at 8-9) But by the time of the hearing on the Motion, Plaintiff was no longer making that case. And indeed, the record indicates that as of July 2021, Plaintiff was incarcerated at HRYCF solely because he was a pretrial detainee who was awaiting resolution of certain pending Delaware state criminal charges.[3] And since pretrial detainees do not fall within the ambit of the Eighth Amendment's protections (because the Cruel and Unusual Punishments Clause does not apply until an inmate has been both convicted and sentenced for his crimes), *see Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Hubbard v. Taylor*, 399 F.3d

---

[3]    It is understandable why Plaintiff's counsel may have had some confusion on this front when Plaintiff filed this case. That confusion likely stemmed from the fact that as of July 2021, Plaintiff: (1) had previously been convicted and sentenced on a felony burglary charge on May 28, 2021 by the Superior Court of the State of Delaware; and (2) was also awaiting sentencing as to a second set of criminal charges in that same court (Plaintiff was later convicted and sentenced as to a number of felony burglary charges in December 2021). (D.I. 69 (citing D.I. 70, ex. L; *id.*, ex. O)) But even though Plaintiff had been sentenced regarding one count of conviction in May 2021, the record shows that he did not receive a term of incarceration as to that conviction. (D.I. 70, ex. L; Tr. at 10-15) Therefore, as of July 2021, Plaintiff could not have been serving any custodial sentence stemming from the May 2021 sentencing. For these reasons, during the hearing on the Motion, Plaintiff's counsel conceded that the record is now clear that, as of July 2021, Plaintiff was incarcerated simply because he was then a pretrial detainee. (Tr. at 81-82)

150, 164 (3d Cir. 2005); *Kost v. Kozakiewicz*, 1 F.3d 176, 188 (3d Cir. 1993), summary judgment

must be granted as to both Defendants regarding Plaintiff's pleaded Eighth Amendment claims.

That does not end the inquiry here, however.  This is because Plaintiff asserts that even if

the Eighth Amendment claims in the Amended Complaint must be thrown out at this stage, the

pleading can also be understood as raising failure to protect claims against both Defendants

pursuant to the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.  (D.I.

76 at 15-18)  In response, while Defendants acknowledge that a state pretrial detainee can be

protected from undue punishment pursuant to the Fourteenth Amendment, *see Bell*, 441 U.S. at

535 & n.16; *Thomas v. Cumberland Cnty.*, 749 F.3d 217, 223 n.4 (3d Cir. 2014), they argue that

the Fourteenth Amendment is of no moment here.  This is so, Defendants say, because Plaintiff

*failed to clearly plead* a failure to protect claim pursuant to the Fourteenth Amendment in the

Amended Complaint.  (D.I. 69 at 8-10)

In order to address that issue, it is helpful to first step back and ask:  What *are* the

elements of a Fourteenth Amendment failure to protect claim?  After all, we need to understand

what those elements are in order to figure out whether Plaintiff sufficiently pleaded that type of a

claim in the first place.  On this front, the parties agree that—at a minimum—the elements of a

Fourteenth Amendment failure to protect claim largely track the elements of an Eighth

Amendment failure to protect claim.  As to the latter type of Eighth Amendment claim, a

plaintiff must provide sufficient evidence to demonstrate that:  "(1) he was incarcerated under

conditions posing a substantial risk of serious harm, (2) the official was deliberately indifferent

to that substantial risk to his health and safety, and (3) the official's deliberate indifference

caused him harm."  *Wood v. Detwiler*, 782 F. App'x 103, 105 (3d Cir. 2019) (internal quotation

marks and citation omitted); *see also Kalu v. Spaulding*, 113 F.4th 311, 341-42 (3d Cir. 2024).

Deliberate indifference under the Eighth Amendment is judged subjectively—"i.e., prison officials knew of and disregarded an excessive risk to inmate health or safety[.]" *Wood v. Russell*, 255 F. Supp. 3d 498, 509 (D. Del. 2017) (citing *Farmer v. Brennan*, 511 U.S. 825, 833-34 (1994)).[4]  Because doing so does not impact resolution of this Motion, the Court will herein assume *arguendo* that a Fourteenth Amendment failure to protect claim requires evidence as to the exact same elements (and no more and no less) as does a failure to protect claim made under the Eighth Amendment.[5]  *See Montgomery v. Onuoha*, C.A. No. 19-001 (MN), 2022 WL

---

[4]      The Eighth Amendment's subjective knowledge requirement means that the prison official in question must *actually be aware* of the existence of the excessive risk; it is not sufficient that the official *should have been aware.  See Beers-Capitol v. Whetzel*, 256 F.3d 120, 133 (3d Cir. 2001); *Wood*, 255 F. Supp. 3d at 510.

[5]      In 2014 and again in 2019, the United States Court of Appeals for the Third Circuit affirmatively stated that it applies the same standard to a failure to protect claim made pursuant to the Fourteenth Amendment as it does to a failure to protect claim brought under the Eighth Amendment—including the use of a subjective standard for the deliberate indifference element. *See Travillion v. Wetzel*, 765 F. App'x 785, 788, 790 (3d Cir. 2019); *Thomas*, 749 F.3d at 217 n.4.  In his briefing, however, Plaintiff argued that in light of the Supreme Court's 2015 decision in *Kingsley v. Hendrickson*, 576 U.S. 389 (2015), the elements of a failure to protect claim made pursuant to the Fourteenth Amendment are now different from those as to such a claim brought pursuant to the Eighth Amendment in one respect:  i.e., that a Fourteenth Amendment claim requires only the use of an *objective* state of mind standard as to knowledge of the risk in question (that the prison official *knew or should have known* of the substantial risk), not a *subjective* state of mind standard (that the official *actually did know* of the risk).  (D.I. 76 at 15-17 (citing *Kingsley*, 576 U.S. 389; *Castro v. Cnty. of L.A.*, 833 F.3d 1060, 1065 (9th Cir. 2016) (en banc)))

       Again, the Court need not definitively resolve this issue now, because the outcome of this Motion would not be impacted by any such decision.  In other words, when the Court concludes below that Plaintiff has sufficient evidence to withstand summary judgment regarding his Fourteenth Amendment failure to protect claim as to Brackett, that conclusion would be the same regardless of whether a subjective or an objective standard was utilized regarding Brackett's state of mind as to knowledge of the risk in question.  And below, when the Court concludes that Plaintiff has insufficient evidence to withstand summary judgment as to such a claim against Vanes, the decision would not differ regardless of which state of mind standard is used.

610754, at *3 (D. Del. Feb. 14, 2022) (stating the same); *Andrews v. Harper*, 576 F. Supp. 3d 305, 315-16 (W.D. Pa. 2021) (concluding the same).

From there, the Court asks: Understanding what the elements of a Fourteenth Amendment failure to protect claim are, did Plaintiff *sufficiently plead* that type of a claim against each Defendant in the Amended Complaint? On this front, in the body of the pleading and in Counts I and II, Plaintiff surely at least asserted facts that "track the typical elements" of such a claim. *Andrews*, 576 F. Supp. 3d at 315. For example, Plaintiff alleged: (1) that he was incarcerated under conditions posing a substantial risk of serious harm (i.e., that he was placed in a cell with Carroll, who had made various comments and taken certain actions indicating that he was a risk to attack and/or sexually assault Plaintiff), (*see* D.I. 44 at ¶ 9); (2) Brackett and Vanes were deliberately indifferent to that substantial risk to Plaintiff's health and safety (i.e., because both men knew of this risk and ignored it—in the case of Vanes, by ordering that Plaintiff remain in the same cell with Carroll, or in the case of Brackett, by failing to intervene in the face of Vanes' decision), (*see id.* at ¶¶ 11-14, 41-61); and (3) Brackett's and Vanes' deliberate indifference caused Plaintiff harm (i.e., it led to his assault by Carroll), (*see id.* at ¶¶ 18-40, 54, 61).

Despite this, Defendants assert that the Amended Complaint is still wanting on this score. Here, Defendants' real gripe is with the way that Plaintiff has *labeled* his claims. As the Court previously noted above, both Count I and Count II are titled "VIOLATION OF THE EIGHTH AMENDMENT[.]" (*Id.* at 7, 9) And in the body of those two Counts, the only amendment of the U.S. Constitution that is referenced by name is the "Eighth Amendment[.]" (*Id.* at ¶¶ 53, 60) Thus, since the "lone two Counts in [the] Amended Complaint are the only statements in the entire Complaint that assert a basis for the Court to have jurisdiction and grounds to provide

relief under federal law or a federal question,[] and [because] both Counts assert claims only under the Eighth Amendment, not the Due Process Clause of the Fourteenth Amendment (or any other federal law or federal question)" Defendants argue that Plaintiff has failed to properly put a Fourteenth Amendment claim at issue in the case.  (D.I. 69 at 9-10)

The Court disagrees, particularly in light of the Supreme Court of the United States' decision in *Johnson v. City of Shelby*, 574 U.S. 10 (2014).  In *Johnson*, the plaintiffs (former police officers of the city of Shelby, Mississippi) brought claims against the city alleging violations of their Fourteenth Amendment due process rights.  574 U.S. at 10.  However, in their complaint, the plaintiffs had failed to invoke 42 U.S.C. § 1983 ("Section 1983")—the statute that provides parties like them with a remedy for constitutional claims pursued against entities such as the city of Shelby.  *Id*. at 10-11.  The district court granted the defendant summary judgment due to the plaintiffs' failure to reference Section 1983, and the United States Court of Appeals for the Fifth Circuit upheld the decision; the Fifth Circuit noted in support that invoking Section 1983 in the pleading would have served an important notice function, in light of "[c]ertain consequences [that] flow from claims [brought pursuant to the statute.]"  *Id*. at 11.  The Supreme Court, however, reversed the Fifth Circuit's decision.  In doing so, the *Johnson* Court explained that because the plaintiffs' complaint had "stated simply, concisely, and directly events that, they alleged, entitled them to damages from the city" such that it "informed the city of the factual basis for the complaint" the plaintiffs were "required to do no more to stave off threshold dismissal for want of an adequate statement of their claim."  *Id*. at 12.  The *Johnson* Court noted that federal pleading rules do not require "dismissal of a complaint for imperfect statement of a legal theory supporting the claim asserted."  *Id*. at 11.  Therefore, the plaintiffs' claims in

*Johnson*—even though they were imperfectly labeled—were adequate, in that they provided sufficient notice to the defendant of nature of the claims and the factual basis for them. *Id*. at 12.

Here, not unlike the plaintiffs in *Johnson*, Plaintiff improperly labeled his claims. But as in *Johnson*, Defendants were still provided with sufficient notice to allow Plaintiff's Fourteenth Amendment claims to go forward. Sure, Plaintiff wrongly titled his claims as "Eighth Amendment" failure to protect claims, when he should have cited instead to the Fourteenth Amendment in Counts I and II. But as was noted above, the elements of those two types of claims are very similar, if not identical. Moreover, the Amended Complaint set out facts sufficient to plausibly assert such claims pursuant to either Amendment. Additionally, here the reason for Plaintiff's mistake was understandable (and one that Defendants might well have recognized): Plaintiff's counsel thought Plaintiff might have been considered a sentenced inmate at the relevant time due to the unusual circumstances of Plaintiff's incarceration, but it turns out Plaintiff was actually a pretrial detainee instead. *See supra* at 6-7 & n.3; *see also* (Tr. at 85). And lastly, the Court notes that in the Amended Complaint, Plaintiff did at least make a reference to the Fourteenth Amendment—when he noted in the pleading's "Jurisdiction and Venue" section that "[t]his is a civil action for damages arising under the Eighth and Fourteenth Amendments to the United States Constitution and 42 U.S.C. §§ 1983 and 1988." (D.I. 44 at ¶ 5) Taking all of the above into consideration—and in light of the guidance provided by the Supreme Court in *Johnson*—the Court cannot grant Defendants summary judgment as to Plaintiff's Fourteenth Amendment claims (or otherwise ignore the existence of such claims) in light of any asserted pleading-related vulnerabilities.

Indeed, our Court recently came to a similar conclusion in *Holliday v. Claudio*, Civ. No. 21-1310-CFC, 2024 WL 552466 (D. Del. Feb. 12, 2024). In *Holliday*, the plaintiff, a pretrial

detainee at the Sussex Correctional Institution at the relevant time, had framed his claims against the defendant (an administrator at the facility) as Eighth Amendment claims. 2024 WL 552466, at *1 n.1. The defendant sought dismissal, on the ground that since the plaintiff was a pretrial detainee, he did not "enjoy Eighth Amendment protection." *Id*. But the *Holliday* Court refused to dismiss the claims on that ground. *Id*. Citing to *Johnson*'s admonition that a plaintiff's complaint should not be dismissed for "imperfect statements of the" law, the *Holliday* Court explained that although the plaintiff had wrongly labeled his claims as Eighth Amendment claims, this was not disqualifying, since "he was entitled as a pretrial detainee to at least the same protections, if not more, under the Fourteenth Amendment." *Id*.

In conclusion here, Plaintiff brings with him to the summary judgment stage two potentially viable Fourteenth Amendment failure to protect claims—one against each Defendant. Next, the Court will evaluate whether one or both of those claims can survive the Motion on the merits, in light of the evidence now of record.

### B.    Failure to Protect Claims

In their briefing, Defendants' main argument as to why summary judgment should be granted on the merits as to Counts I and II implicates the deliberate indifference element of a failure to protect claim. In other words, Defendants argue that there is insufficient evidence that either of them actually knew that Carroll posed a substantial risk of physical harm to Plaintiff as of July 7, 2021 (hereafter, "July 7"). Thus, the Court will primarily focus on that issue herein.

"Prison officials are deliberately indifferent when they are aware that a prisoner faces a substantial risk of serious harm yet fail to take reasonable steps to avoid the harm." *Cropper v. Danberg*, C.A. No. 12-969-LPS, 2019 WL 3494992, at *4 (D. Del. Aug. 1, 2019); *see also Farmer*, 511 U.S. at 837. Since deliberate indifference is a subjective standard, "the prison

12

official . . . must actually have known or been aware of the excessive risk to inmate safety" and ignored it. *Kalu*, 113 F.4th at 342 (quoting *Beers-Capitol*, 256 F.3d at 125) (internal quotation marks omitted); *see also Fletcher v. Little*, 5 F. Supp. 3d 655, 663 (D. Del. 2013). Actual knowledge of a substantial risk may be established in various ways, including "indirectly by circumstantial evidence." *Beers-Capitol*, 256 F.3d at 131; *see Bistrian v. Levi*, 696 F.3d 352, 367 (3d Cir. 2012) (concluding that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious") (quoting *Farmer*, 511 U.S. at 842) (internal quotation marks omitted), *abrogation on other grounds recognized in Mack v. Yost*, 968 F.3d 311, 319 n.7 (3d Cir. 2020). Additionally, a plaintiff may establish knowledge using record evidence that indicates that he told the defendant "of any specific incident or cause of tension between the cellmates from which a greater inference of risk could be drawn" or evidence which "demonstrates that a substantial risk was 'longstanding, pervasive, well-documented, or expressly noted by prison officials in the past.'" *Blackstone v. Thompson*, 568 F. App'x 82, 84 (3d Cir. 2014) (quoting *Farmer*, 511 U.S. at 842).

The record as to the deliberate indifference element is different with respect to each Defendant. The Court will therefore discuss below whether summary judgment should be granted as to Brackett and Vanes in turn.

### 1.    Brackett

With regard to Brackett, the Court concludes that there is a genuine issue of material fact as to whether he was deliberately indifferent to a significant risk of harm that Carroll posed to Plaintiff as of July 7.

To that end, Plaintiff's theory as to what occurred on July 7 is that: (1) Plaintiff told Brackett, both in writing and verbally, that he feared that Carroll was about to physically harm

him; (2) Brackett therefore knew about this danger—and took the threat seriously enough to have Plaintiff immediately moved out of his cell with Carroll and into another cell; and (3) yet when Vanes later overruled Brackett's decision, and ordered Plaintiff back into his original cell with Carroll, Brackett wrongfully "failed to intervene" to stop Vanes' decision from being carried out.[6]  (Tr. at 70; *see also* D.I. 44 at ¶¶ 41-54)  And there is evidence of record to support this theory, including the following:

- Plaintiff testified that as of July 7, Carroll, who outweighed him by as much as 150 pounds and who was then facing various rape- and assault-related charges, had made multiple sexually charged comments or overtures toward Plaintiff (such as by staring at Plaintiff's physique and "ogling" him, or by telling Plaintiff he should "be a model[,]" or by saying that Plaintiff was attractive enough such that he could "take women from another man").  (D.I. 77, ex. B at 35, 38-39, 42-47) Plaintiff also explained that just days before the assault, Carroll grabbed Plaintiff's wrists, forcing Plaintiff to struggle to "pull away"; Plaintiff understood this to be a "strength test[,]" wherein Carroll was "gauging his prey" to see how strong Plaintiff was and whether Plaintiff might fight back if later attacked.  (*Id*. at 37-38)  All of this caused Plaintiff to fear that Carroll was likely to attack/sexually assault him soon.

- Plaintiff testified that on July 7, he wrote a note on a piece of notebook paper intended for the prison guards in his area.  (*Id*. at 54)  While Plaintiff could not recall the exact words he used

---

[6]     Pursuant to Third Circuit caselaw, this type of "failure to intervene" theory is one path that a plaintiff can use to make out a failure to protect claim pursuant to the Eighth or Fourteenth Amendments.  *See, e.g.*, *Smith v. Mensinger*, 293 F.3d 641, 650-51 (3d Cir. 2002) (explaining that as to an inmate's Eighth Amendment excessive force claim, a corrections official could be liable for a violation if he "had a reasonable opportunity to intervene and simply refused to do so[,]" and that an officer cannot "escape liability [for such a claim] by relying upon his inferior or non-supervisory status vis-à-vis [] other officers"); *see also Bistrian*, 696 F.3d at 371 (extending the *Smith* "failure to intervene" standard to circumstances where a correctional official fails to intervene to protect against an inmate-against-inmate attack); *Brown v. Warden of Cumberland Cnty. Jail*, No. 19-cv-21965 (NLH) (JS), 2020 WL 1910337, at *2-3 (D.N.J. Apr. 20, 2020) (permitting an Eighth Amendment "failure to intervene" claim to go forward against defendant corrections officers, where the plaintiff inmate alleged that the defendant officers had failed to protect him from violence at the hands of other inmates).

in this note, he testified that the note "basically said that [he] want[ed] to move out of [his] cell and [he] didn't feel safe" and that he wanted to speak with a guard about this "whenever possible[.]"  (*Id*. at 55)  Plaintiff then discreetly slipped the note under the officers' module door.  (*Id*. at 55-56)

- Plaintiff testified that Brackett received the note, and thereafter called Plaintiff "over the intercom discreetly and told [Plaintiff] that he needed to speak to [him] in the interview room[.]"  (*Id*. at 57-58)  When the two men met up, Plaintiff told Brackett that he "wanted to be moved out of the cell" because he "[did not] feel comfortable."  (*Id*. at 58)  Plaintiff further explained that he and Carroll had "lifestyle differences[,]" in that Plaintiff believed that Carroll "liked men[,]" while Plaintiff did not. (*Id*.)  Plaintiff testified that he told Brackett that he "fe[lt] like something may happen today [between Carroll and Plaintiff], something may happen and I don't feel safe."  (*Id*.)  Plaintiff noted that during this conversation, he may also have called Carroll "weird"—as a way of telling Brackett that Carroll "was gay and that I don't feel safe around this gay person physically."  (*Id*. at 59)  But Plaintiff reiterated that he made this comment about Carroll being "weird" *in addition* to his other comments about feeling unsafe due to Carroll and that "something may happen" with Carroll.  (*Id*. at 60 (Plaintiff, when asked why if he was "in fear for [his] safety" would he "use a word like weird and leave it up to an inference that Brackett would have to understand[,]" responding that "I didn't say weird first.  I said weird second [i.e., *after* having communicated his concerns regarding his physical safety to Brackett]."); *see id*. at 112)

- According to Plaintiff, Brackett indicated that he understood Plaintiff's statements that "we have . . . lifestyle differences and [Carroll] likes men and I think that something is going to happen" to amount to a communication that Plaintiff feared that Carroll would soon attempt to assault Plaintiff.  (*Id*. at 59)  Plaintiff explained that Brackett expressed this understanding by saying "ohhh" and nodding after Plaintiff expressed these concerns.  (*Id*.)

- Less than three hours later, Plaintiff was moved from his cell with Carroll into a different cell in the same unit/pod of the prison.  (*Id*. at 60-61)  In order to make this happen, Brackett had to get approval from two supervisors:  Sergeant Ritter and Lieutenant Stewart.  (*Id*., ex. D at 71, 87-88; *id*., ex. J)

- When Vanes later contacted Brackett that day and told Brackett to move Plaintiff back into his original cell with Carroll (without explaining to Brackett why he had made this decision), Brackett testified that he followed Vanes' order, did not ask any additional questions, and simply "did what [he was] told[.]" (*Id.*, ex. D at 111-14, 120)  The next day, Carroll assaulted Plaintiff in the cell.  (*Id.*, ex. B at 74-78)

In the Court's view—and after drawing all reasonable inferences in Plaintiff's favor (as it must here)—a reasonable jury could conclude that based on these facts, Brackett knew that Plaintiff faced a substantial risk of physical harm from Carroll as of July 7 and yet failed to sufficiently intervene to stop Carroll from harming Plaintiff.  Although there is no assertion that Brackett was told about Carroll's prior sexually suggestive comments or actions toward Plaintiff, nor about the "strength test" that Carroll gave to Plaintiff just before the attack, (Tr. at 114-15), Plaintiff *does* clearly state that he conveyed to Brackett (both in writing and verbally) that he felt that there was an imminent threat that Carroll would attack him ("something is about to happen") causing him to fear for his safety ("I don't feel safe").  (Tr. at 52-53)[7]  And there is some evidence that Brackett did indeed take this threat seriously—i.e., Brackett quickly obtained permission from two supervisors to move Plaintiff out of his cell with Carroll.  A factfinder could reasonably conclude that Brackett's later failure to intervene and challenge Vanes' reversing order amounts to deliberate indifference to a substantial risk of harm.  *See, e.g., Rinaldi*

---

[7]    During argument on the Motion, Defendants' counsel noted that Plaintiff did not testify to using phraseology in his conversation with Brackett such as "I think he's going to rape me" or "He's going to physically attack me."  (Tr. 54; *see also* D.I. 69 at 14)  And that is true. But giving Plaintiff the benefit of all reasonable inferences, Plaintiff's alleged statements to Brackett that Plaintiff did not "feel safe" around Carroll and that "something may happen today" with Carroll could be seen as equivalent to a statement like "I think Carroll is going to physically attack me today."  After all, in the context of Plaintiff's conversation with Brackett, what else could the "something" be that "may happen" that would cause Plaintiff not to "feel safe" from Carroll?  (Tr. at 56-59, 110-11)

*v. United States*, No. 1:13-cv-450, 2019 WL 1620340, at *15 (M.D. Pa. Apr. 16, 2019) (finding that a defendant corrections officer's motion for summary judgment should be denied as to an Eighth Amendment failure to protect claim, where the plaintiff inmate asserted that he had reported to the defendant that another officer had threatened to place him in a cell with an assaultive inmate, and that the defendant responded by saying he "wasn't going to get involved in what is going on because it is over his head") (internal quotation marks and citation omitted); *Jones v. Carroll*, 628 F. Supp. 2d 551, 559-60 (D. Del. 2009) (permitting the plaintiff's failure to protect claim to survive summary judgment as to certain defendants, where the claim turned on whether the plaintiff had told those defendants about another prisoner's violent threats, and where the plaintiff testified that he spoke with the defendants concerning the threats (even though the defendants maintained they did not have any knowledge of the threats or other aggravating circumstances prior to plaintiff's assault)); *see also Rand v New Jersey*, Civ. No. 12-2137 (FLW), 2015 WL 1116310, at *11 (D.N.J. Mar. 11, 2015) (finding that the plaintiff's allegations that she told two defendants prior to her attack at the hands of another inmate that the inmate was behaving erratically and threatening her was enough to demonstrate, at the summary judgment stage, a sufficient issue of fact as to whether the defendants knew she faced a substantial risk of harm).[8]

---

[8]     *Cf. Bistrian*, 696 F.3d at 368-71 (permitting Eighth Amendment failure to protect claims to proceed past the pleading stage, where the plaintiff inmate alleged that he repeatedly advised officials, both verbally and in writing, of threats he received as a result of helping an investigation that targeted those with whom he was placed); *Blackstone*, 568 F. App'x at 82-84 (concluding that summary judgement should be granted to the defendant regarding an Eighth Amendment failure to protect claim, but where the plaintiff (an inmate) had just one communication with the defendant (a prison officer) prior to being assaulted by another inmate, and where in that conversation, the plaintiff told the defendant only that "he was not 'getting along' and did not 'feel comfortable' with his cellmate"—but where the defendant was not

Now, to be sure, there is another side to this story.  Brackett testified that he recalled receiving Plaintiff's note on July 7, but that the note stated only that Plaintiff "needs to speak to me about being moved."  (D.I. 77, ex. D at 67)  Brackett also testified that while he spoke with Plaintiff shortly thereafter, when he asked Plaintiff why he wanted to move cells, Plaintiff only responded by saying that "his cellmate was weird"—and nothing more.  (*Id*. at 70-72)  Brackett said that he told Plaintiff that he "just can't move" an inmate from one cell to another because that inmate thinks his cellmate is "weird"; Brackett explained that Plaintiff "ha[d] to give [Brackett] . . . [some other] reason why to move [Plaintiff.]"  (*Id*. at 70-71)  Nevertheless, Brackett testified that "all [Plaintiff] kept saying [in response was that Carroll was] weird" and that Plaintiff did not "want to stay in there with him [because h]e's weird."  (*Id*. at 70-71)[9]

As for his reason for initially agreeing to move Plaintiff out of the cell with Carroll, Brackett testified that he did *not* make the decision due to Plaintiff having told him that he feared for his safety due to Carroll (since Brackett says that Plaintiff never told him this at all). Instead—and even though Brackett acknowledges that simply saying that one thinks their cellmate is "weird" is not a sufficient reason to permit an inmate to move cells, and despite the fact that Brackett says this is all that Plaintiff conveyed to him on July 7—Brackett testified that he agreed to move Plaintiff anyway.  (*Id*. at 97-98)  Brackett testified that he did so because he was worried that had he simply rejected Plaintiff's request to move cells, Plaintiff might have

provided with a note that the plaintiff had written stating that he believed that the cellmate "may try to assault me in the cell tonight") (internal quotation marks and citation omitted).

[9]     The parties do not dispute, for purposes of the Motion at least, that if an inmate felt his cellmate was "weird," that alone would not be a sufficient reason for a prison officer to move the inmate to a different cell.

"refused to go into his cell [with Carroll,]" which would have caused Plaintiff to be subject to further discipline. (*Id*. at 98-99)  Brackett stated that he was trying to avoid that outcome. (*Id*.)[10]

Brackett may be right about what happened in those important conversations, and about what his motives were in agreeing to the initial cell transfer.  But a jury could well draw a different conclusion—i.e., that Plaintiff *did* communicate to Brackett his fear of imminent danger, and that Brackett moved Plaintiff's cell because Brackett *did* feel this fear was well taken.[11]  This is the summary judgment stage of the case.  And when there are genuine disputes of fact on material issues, as here, those disputes are for the jury to resolve.  *See Jones*, 628 F. Supp. 2d at 559 (noting that where a key issue regarding a failure to protect claim comes down to a "battle of '[the plaintiff's] word against [the defendants' word]'" it is not a court's role to make such "credibility determinations" at the summary judgment stage).

---

[10]    Defendants also point to testimony from Sergeant Ritter to the effect that if an inmate was truly seen as a physical threat to another inmate, then one of those inmates would always be moved out of the particular housing unit altogether (i.e., they would not have been moved to another cell on the same pod, as occurred here with Plaintiff). (D.I. 69 at 17-18 (citing D.I. 70, ex. E at 43, 48-49))  According to Defendants, "this clearly shows that Brackett did not believe [Plaintiff's] safety was at risk." (*Id*. at 18)  This surely seems like one conclusion that a factfinder could draw.  But it also seems plausible that a factfinder could draw another conclusion:  i.e., that Brackett's decision to move Plaintiff's cell so quickly indicates that Brackett *did* think Plaintiff's safety was at risk—and that he took fast action as a result, in order to get Plaintiff out of harm's way as swiftly as possible.

[11]    For example, a jury might question why Brackett agreed to move Plaintiff from his cell when, in Brackett's telling, Plaintiff had not given him a sufficient reason to support such a move.  This oddity could cause the jury to conclude that Plaintiff had in fact communicated his fear of imminent harm to Brackett (and that Brackett now is either failing to remember this, or is not accurately relaying what Plaintiff said on that score). (D.I. 76 at 5-6, 15)

For these reasons, the Court denies Defendants' Motion as to Count I regarding Plaintiff's Fourteenth Amendment failure to protect claim against Brackett.[12]

### 2.    Vanes

The Court turns now to the allegations relating to Vanes.  Here, the Court concludes that the state of affairs is different than it was as to Brackett.  For the reasons set forth below, Plaintiff has not sufficiently demonstrated that Vanes actually knew of facts on July 7 showing that Plaintiff faced "a substantial risk of serious harm" from Carroll.  *Farmer*, 511 U.S. at 837.[13]

To explain why, the Court starts by again noting that according to Brackett, when he spoke with Plaintiff on the day in question, Plaintiff never told him that Carroll presented a danger.  Instead, Brackett maintains the only reason Plaintiff gave for the requested cell transfer was that he felt Carroll was "weird."  (D.I. 77, ex. D at 70-71, 73)  From there, Brackett testified that after he arranged for Plaintiff to transfer cells on July 7, he spoke with Vanes on two occasions later that day.  According to Brackett, the first phone call with Vanes (who was Brackett's "supervisor in the building") occurred shortly after the transfer.  (*Id.* at 108, 115)  Carroll had approached Brackett after Plaintiff was moved out of his cell, and had asked to speak

---

[12]    Plaintiff may also have another (related) type of failure to protect theory that it intends to press at trial as to Brackett.  If Plaintiff did communicate to Brackett that Plaintiff was in fear of being attacked by Carroll (as Plaintiff says he did), but if Brackett never communicated this to Vanes (as Brackett says he did not), then Plaintiff may assert that Brackett failed to protect Plaintiff simply by *failing to share this important information with Vanes in the first place*.  (Tr. at 70-76, 80, 95; *see also* D.I. 44 at ¶ 51(b))  This seems like it could be a different type of failure to protect theory than the assertion that Brackett committed a Fourteenth Amendment violation by *failing to intervene when Vanes ordered Plaintiff to be moved back to the cell with Carroll*.  In light of what the Court has set out herein, both of these (perhaps related) failure to protect-type theories seem viable against Brackett at trial.

[13]    And again, for the reasons set out herein, even were the applicable standard of knowledge a "should have known" standard, the Court's decision here would remain unchanged.

with Vanes about the move.  (*Id.* at 116)  Brackett then spoke to Vanes by phone and told Vanes

that Carroll wanted to talk with him; Vanes, who said he was familiar with Carroll, told Brackett

to have Carroll sent to him.  (*Id.* at 115-17)  After Carroll went to see Vanes, (*id.*, ex. K at

DOC000470), Vanes called Brackett and spoke to him a second time, (*id.*, ex. D at 118-20).

During this second call, Vanes simply told Brackett to move Plaintiff back into his old cell with

Carroll, without providing any reason for this decision.  (*Id.* at 112, 120)  Bracket had "no other

conversation" with Vanes during that second "brief" call, and did not challenge Vanes' decision

in any way; instead, Brackett testified that he simply moved Plaintiff back into his original cell

with Carroll, just as Vanes had instructed.  (*Id.* 112-14, 120)  Thus, it is undisputed that,

according to Brackett, he did not mention anything to Vanes about Plaintiff having

communicated that he did not "feel safe" around Carroll, or about Plaintiff having said that he

felt that something "may happen" between him and Carroll.

 As for Vanes, he too testified that Brackett never mentioned anything to him on July 7

about Plaintiff having made comments regarding a danger posed by Carroll.  Vanes' recollection

is that he spoke with Brackett only once on July 7.  (*Id.*, ex. C at 185)  According to Vanes,

during that phone call, Brackett told him that Plaintiff wanted to move cells "because he thinks

his cellmate is weird."  (*Id.* at 184-85)  Vanes recalled that "that's all [Brackett] could give" as a

reason why Plaintiff wanted to move cells, and that Brackett provided "no other reason" for any

move; Vanes responded by saying this rationale for a cell change was insufficient, as "you can't

move [a cellmate solely] for being weird."  (*Id.* at 185, 188, 191)  Vanes confirmed that on this

call with Brackett, Brackett said nothing about Plaintiff having expressed any concern about his safety due to Carroll, or that Carroll might want to injure or rape Plaintiff.  (*Id*. at 189)[14]

Additionally, it is undisputed that Plaintiff never spoke directly with or otherwise communicated with Vanes on July 7.  (*Id*., ex. B at 82; *id*., ex. C at 189; *see* D.I. 69 at 17)  Nor is there any evidence that Vanes took an action on July 7 that facially suggests that Vanes had somehow heard that Plaintiff thought Carroll to be an imminent threat.  Indeed, as was noted above, Vanes ordered Plaintiff back into his cell with Carroll; if anything, this fact suggests that Vanes was unaware of any threat to Plaintiff.  And although Carroll was in HRYCF on multiple charges of rape and other violent crimes, (D.I. 77, ex. C at 141-42), there is insufficient evidence to conclude that Vanes was aware of this at the time.[15]

Summing up the record then, prior to the assault in question, there is simply no credible evidence that anyone ever told Vanes anything about:  (1) Carroll having engaged in threatening statements toward Plaintiff, or (2) Plaintiff having communicated his fear for his own safety due

---

[14]    Vanes testified that he was not aware, as of his July 7 call with Brackett, that Plaintiff had already been moved out of the cell he shared with Carroll.  (Tr. at 185)  Vanes also stated that while it is possible that he could have done so, he did not recall speaking to Carroll on July 7 (as Brackett had testified).  (*Id*. at 192)

[15]    On this point, Vanes testified that he was not aware of what charges Carroll faced as of July 7.  (Tr. at 141, 154)  Plaintiff responds only by noting that Vanes was the Prison Rape Elimination Act ("PREA") compliance manager for HRYCF, (*id*. at 34); Plaintiff suggests that this could mean that Vanes was aware of information relating to Carroll's pending charges (in that those charges would have factored into the PREA "score" that Carroll received when he arrived at HRYCF), (D.I. 76 at 13-14 (citing D.I. 77, ex. C at 50-52, 55, 141-42)).  But Carroll was but one of many inmates at HRYCF.  And there is no record evidence suggesting that Vanes ever looked at or was aware of Carroll's PREA score, or that he knew of any particular input that went into creating Carroll's score.  Therefore, on this record, one cannot reasonably infer that Vanes was actually aware of the nature of the charges that Carroll faced as of July 7.  (D.I. 79 at 6)

to Carroll being his cellmate. (Tr. at 89-92) In the absence of any such evidence, the Court does not see how a reasonable jury could conclude that Vanes was actually aware of a substantial risk that Plaintiff would harm Carroll as of July 7. (D.I. 79 at 7)

Plaintiff nevertheless raises two arguments in opposition to this conclusion. In the Court's view, neither is persuasive.

First, Plaintiff asks the Court to infer that (even though both Brackett and Vanes testified that this did not occur) Brackett *must have told* Vanes that Plaintiff had expressed concern to Brackett about Carroll being ready to attack Plaintiff. (Tr. at 76, 92-94) But with the only parties privy to the Brackett/Vanes conversation(s) on July 7 having testified under oath that no such discussion occurred, and with no other compelling evidence of record to the contrary, the Court simply does not see how a reasonable jury could conclude otherwise. *See Jones*, 628 F. Supp. 2d at 555, 559-60 (granting summary judgment as to plaintiff's failure to protect claim brought against a defendant correctional officer with whom plaintiff had never spoken prior to the assault in question, since the plaintiff had "produce[d] no evidence showing that [the officer] had actual notice of the excessive risk" nor did any other "circumstances demonstrate that [the officer] had been exposed to information concerning this risk").[16]

---

[16]    *See also Goodman v. Kimbrough*, 718 F.3d 1325, 1334 (11th Cir. 2013) (affirming the district court's grant of summary judgment as to Fourteenth Amendment claims against defendant correctional officers, where the "only evidence of what [the defendants] were actually aware of is their own adamant denials of the fact that they ever feared for [the plaintiff's] safety in any way"); *McDowell v. Odum*, CIVIL ACTION NO.: 6:19-cv-24, 2022 WL 2311998, at *8 (S.D. Ga. June 7, 2022) (concluding that summary judgment should be granted to a correctional officer defendant on an Eighth Amendment failure to protect claim, where "there is no evidence that [the defendant] was aware of the complaints Plaintiff made to [another defendant] and others that Inmate Stone posed a threat to him or that he feared for his safety. Indeed, [the defendant] was not present when Plaintiff vocalized these concerns[.]"); *Jones v. Williams*, Case No. 18-cv-03686, 2021 WL 3408508, at *15 (N.D. Ill. Aug. 4, 2021) ("[The plaintiff] has not come forward with any evidence that Officer Williams knew that [he]

Second, Plaintiff points to evidence that in two other instances—both occurring prior to his becoming Plaintiff's cellmate—Carroll threatened other HRYCF inmates.  In March 2021, Carroll grabbed another inmate, refused a guard's orders to lock himself into his cell and then picked up a broom in an attempt to "get to" the other inmate.  (D.I. 77, ex. G; *id*., ex. I at 15-16)  Later in June 2021, Carroll walked up to an inmate and "smack[ed] him" after the inmate took milks off of a food cart.  (*Id*., ex. H; *id*., ex. I at 16-17)  These two incidents were documented in disciplinary reports.  (*Id*., ex. G; *id*., ex. H)  And there is evidence that in his role as facility investigator, Vanes would have reviewed reports like these around the time that they were completed.  (*Id*., ex. C at 61-63; *id*., ex. F at 35-37)  But even assuming that Vanes was aware of these past incidents as of July 7, the Court cannot conclude that knowledge of that fact could equate to knowledge that Carroll posed a substantial risk of harm to Plaintiff on that date.[17]

---

was in danger.  [The plaintiff] offered evidence that he told Officer *Martin* about the threat.  But he offered no evidence that he told Officer Williams about the threat, too. . . .  He doesn't offer evidence that anyone else told Officer Williams about the threat, either.") (emphasis in original); *Ogunleye v. Bedolla*, Case No. 18 C 6249, 2020 WL 5702164, at *4 (N.D. Ill. Sept. 24, 2020) (granting summary judgment to correctional officer defendants as to a Fourteenth Amendment claim, where there was no record evidence that these defendants had heard a prior conversation between the plaintiff and his attacker that could have provided evidence of a risk of harm, and they had no prior information about a possible problem between the two men (and distinguishing these defendants from another defendant who had been told by the plaintiff prior to the attack that plaintiff "believed he was in trouble" due to the attacker's intimidating comments to him)); (Tr. at 94 (Plaintiff's counsel acknowledging that he "[did not] disagree" that it would be difficult for the Court to find a genuine issue of material fact on this score, since Plaintiff's assertion is that the conversation between Vanes and Brackett "included certain substance [and yet] none of the people involved say it does and no other person heard it"); *id*. at 106, 133).

[17]    Surely it cannot be the case that if a corrections officer knows that an inmate has been previously disciplined for aggressive behavior, this necessarily means that the inmate poses a substantial risk of future harm to any other person in the same part of the prison where the inmate is housed.  (Tr. at 61-62, 131)  As the Third Circuit has explained, the "risk that an inmate with some history of violence might attack another inmate for an unknown reason, however, is too speculative to give rise to an Eighth Amendment claim."  *Blackstone*, 568 F. App'x at 83-84 (rejecting the idea that simply because an inmate carried a status of "'H-code,'

For these reasons, the Court grants Defendants' Motion as to Count II regarding

Plaintiff's Fourteenth Amendment failure to protect claim against Vanes.

## IV.   CONCLUSION

For the foregoing reasons,[18] the Motion is GRANTED-IN-PART and DENIED-IN-

PART as to Count I against Brackett, in that it is GRANTED as to any assertion of an Eighth

---

signifying that he was a high risk inmate" this showing alone could be sufficient to allow a plaintiff to withstand summary judgment as to the deliberate indifference element). Now, perhaps it is possible that in rarer cases, a particular inmate's prior history of violent behavior is so serious and widespread that it could be said that he poses a substantial risk to *any* cellmate he is placed with thereafter. *See, e.g., Brown v. Budz*, 398 F.3d 904, 915 (7th Cir. 2005) (citing cases). But even Plaintiff does not appear to argue that this was the case as to Carroll.

[18]    In their briefing, Defendants did at times raise other merits-based reasons as to why summary judgment should be granted—other than those regarding the deliberate indifference element. But for the reasons set out below, the Court has not discussed those arguments in detail herein.

For example, Defendants seemed to contest the sufficiency of evidence as to the first element of a failure to protect claim: i.e., whether Plaintiff was incarcerated under conditions that actually posed a substantial risk of serious harm due to Carroll. (D.I. 69 at 16; D.I. 79 at 3) The Court concludes that, to the extent this is even still disputed, Plaintiff has demonstrated that a genuine issue of material fact exists as to this first element. This is so in light of the following evidence of record: (1) Carroll was in prison at the relevant time on charges of rape, unlawful imprisonment, assault and terroristic threatening, (D.I. 77, ex. C at 141-42); (2) Carroll had huge physical size and weight advantages as compared to Plaintiff, (*see supra* at 14); (3) Carroll had two prior incidents while in prison where he attempted to physically harm another prisoner, (*see supra* at 24); (4) Carroll had made numerous sexually suggestive comments or actions to Plaintiff prior to the attack, (*see supra* at 14); and (5) shortly before the attack, Carroll grabbed Plaintiff's wrists, in order to test Plaintiff's strength, (*see id.*). (Tr. at 119) Indeed, during the Motion hearing, after the Court laid out this evidence and asked Defendant's counsel how Defendants were suggesting that no material dispute of fact remained as to this first element, Defendants' counsel did not have a substantive response. (Tr. at 66, 68)

Additionally, Defendants argued in their briefing that even if Plaintiff pointed to sufficient evidence to withstand summary judgment as to the elements of a failure to protect claim, the Court should nevertheless grant summary judgment on qualified immunity grounds. (D.I. 69 at 10-15, 19-20; D.I. 79 at 10) However, in doing so, Defendants seemed to be fighting against a straw man. Defendants' argument here was that Plaintiff "appears to allege that the specific right violated in his case was an inmate's right not to be housed with a cellmate who that

Amendment failure to protect claim, but DENIED as to a Fourteenth Amendment failure to protect claim. And the Motion is GRANTED in full as to Count II against Vanes. An appropriate Order will issue.

---

inmate perceives as weird, or the right for an inmate not to be house[d] with a cellmate who is homosexual or has differing sexual preferences." (D.I. 69 at 19; *see also id*. at 13, 15) But Plaintiff was alleging no such thing. (Tr. at 120-22) Instead, both sides agree that, at the relevant time, there was a clearly established right for Plaintiff to be free from physical violence at the hands of other inmates (and to be free from a defendant's deliberate indifference towards a substantial risk that such violence would occur). (D.I. 69 at 19; D.I. 76 at 18; D.I. 79 at 10; Tr. at 47-49); *see, e.g.*, *Fletcher*, 5 F. Supp. 3d at 663 ("Prison officials have a duty to protect inmates from violence by other inmates.") (citing *Farmer*, 511 U.S. at 833), *aff'd on other grounds sub nom. Fletcher v. Phelps*, 639 F. App'x 85 (3d Cir. 2015); *Harper v. United States*, Civil Action No. 3:12-CV-1292, 2014 WL 1745872, at *16 (M.D. Pa. May 1, 2014) (finding a clearly established "constitutional right to be free from violence at the hands of fellow inmates" and noting it is clearly established that "deliberate or reckless disregard for an inmate's right not to be assaulted is a constitutional violation") (internal quotation marks and citations omitted). What Plaintiff disagreed with was whether the evidence of record was sufficient to withstand summary judgment as to whether Brackett and Vanes *knew of a risk of physical violence that Plaintiff faced from Carroll*. In the Court's view, resolution of *that* dispute does not implicate the need for a separate, different qualified immunity-related inquiry at this stage. (Tr. at 47-49; *see also* D.I. 76 at 11) And indeed, during argument on the Motion, Defendants' counsel seemed to agree that the deliberate indifference issue was the key issue in terms of resolution of the Motion. (Tr. at 49-50)